**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **BENJAMIN DAVIS, #292-280** | * | |
| Plaintiff | * | |
| | * | |
| v | * | Civil Action Case No. RWT-11-39 |
| | * | |
| **CO II CADY** | * | |
| **CO II PETERS** | * | |
| **CO II ROBEY (male)** | * | |
| **CO II ROBEY (female)** | * | |
| Defendants | * | |
| | *** | |

**MEMORANDUM OPINION**

Benjamin Davis ("Davis") filed suit Defendants under 42 U.S.C. § 1983 for use of excessive force. Defendants, Correctional Officer II Martin Cady, Correctional Officer II Craig Peters, Correction Officer II David Robey, and Correctional Officer II Rebecca Robey, through counsel have filed a Motion for Summary Judgment (ECF No. 14). Davis was notified of Defendants' dispositive pleading and was given an opportunity to reply, but has not done so. The issues are fully briefed, and the Court rules pursuant to Local Rule 105.6 (D. Md. 2011) that no hearing is necessary. For the following reasons, Defendants' motion for summary judgment will be granted.

**I.    CLAIMS PRESENTED**

Davis, an inmate confined at North Branch Correctional Institution ("NBCI"), alleges Correctional Officers II Cady and Peters used excessive force against him by slamming a plastic security shield against his arm and pinning his arm against the wall and cell door slot for more than 45 minutes. *See* Compl., ECF No. 1 at 4. Plaintiff claims as a result of the force he slipped in and out of consciousness and suffered a mild heart attack. *Id.* at 5. He alleges two guards, Correctional Officers II Robey (one male and one female), who were on the tier, ignored his

screams during the incident.  *Id.*  Davis claims that when Lieutenant Dolly removed the shield, he collapsed and was rushed to the medical department.  *Id.*  Plaintiff purports to have filed an Administrative Remedy Procedure request, but the complaint was not processed.  *Id.*  Davis seeks nominal, compensatory, and punitive monetary damages of unstated sum as redress.  *Id.*

## II.    DEFENDANTS' EXHIBITS

### A.  Affidavits of Correctional Officers Cady and Peters

Defendants' verified and undisputed exhibits demonstrate the following.  On December 20, 2009, Davis refused to allow his feed up slot to be closed.  *See* Defs. Mot., Ex. 1, Decl. Corr. Officer Martin Cady  ¶4, ECF No. 14-2; Defs. Mot., Ex. 2, Decl. Corr. Officer Craig Peters ¶4, ECF No. 14-3.  Davis was apparently upset that Correctional Officers on an earlier shift had damaged some of his photographs during a cell search and wanted the matter addressed.  *See* Defs. Mot., Ex. 7, Internal Investigative Unit Report at 19, ECF No. 14-8.  Davis was ordered by correctional staff to close the slot to prevent creating a security risk for staff and other inmates. *See* Defs. Mot., Ex. 1, Decl. Corr. Officer Martin Cady  ¶4, ECF No. 14-2; Defs. Mot., Ex. 2, Decl. Corr. Officer Craig Peters ¶4, ECF No. 14-3.  Davis refused to comply.  *See* Defs. Mot., Ex. 2, Decl. Corr. Officer Craig Peters ¶4, ECF No. 14-3.  Instead, he placed his hand in the open slot to prevent it from closing.  *See* Defs. Mot., Ex. 1, Decl. Corr. Officer Martin Cady  ¶4, ECF No. 14-2; Defs. Mot., Ex. 2, Decl. Corr. Officer Craig Peters ¶4, ECF No. 14-3.  A protective plastic shield was placed in front of the cell to prevent Davis from throwing items at staff or other inmates.  *See id*; *see also* Defs. Mot., Ex. 7, Internal Investigative Unit Report at 17, ECF No. 14-8.  Correctional Officers Cady and Peters both attest that neither Davis' arm nor any part of his body was lodged or caught against anything.  *See* Defs. Mot., Ex. 1, Decl. Corr. Officer

Martin Cady  ¶4, ECF No. 14-2; Defs. Mot., Ex. 2, Decl. Corr. Officer Craig Peters ¶4, ECF No. 14-3.  His arm and the rest of his body were in the cell.  *See id*.  The Officers attest that Davis did not complain or state that he was pinned or lodged against anything when the shield was placed in front of the door.  *See id.*

### B.  Affidavit of LieutenantDolly

 Lieutenant Ernest Dolly attests that when he asked to speak with Davis, he observed a plastic barrier shield placed loosely over the door and Davis' hand and arm extended through the door slot.  *See* Defs. Mot., Ex. 3, Decl. Lt. Ernest Dolly ¶4, ECF No. 14-4.  Lieutenant Dolly instructed Plaintiff to stop breaching the cell door slot and he complied by withdrawing his hand and arm back inside his cell.  *See id*.

### C.  Affidavits of Correctional Officer David Robey and Rachel Robey

Correctional Officer II David Robey denies any knowledge of the incident at issue.  *See* Defs. Mot., Ex. 4, Decl. Corr. Officer David Robey ¶4, ECF No. 14-5.  On December 20, 2009, Correctional Officer David Robey was assigned to the Visitation Post and he was not present in Housing Unit 1 where Davis's cell was located.  *See id*.

Correctional Officer Rebecca Robey attests that she was not present in Housing Unit 1 on December 20, 2009, because she was assigned to Housing Unit 2-A wing.  *See* Defs. Mot., Ex. 5, Decl. Corr. Officer Rebecca Robey ¶4, ECF No. 14-6.  The Post Assignment Worksheet for December 20, 2009 shows that Officer D. Robey was assigned to the visiting control #2, and Officer R. Robey was assigned to Housing Unit 2.  *See* Defs. Mot., Ex. 6, Post Assignment Worksheet for December 20, 2009, ECF No. 14-7.

### D.  Investigation Unit Report

On December 28, 2009, Davis wrote a letter complaining about the December 20, 2009, incident to the State's Attorney for Allegany County.  *See* Defs. Mot., Ex. 7, Internal Investigative Unit Report at 1 & 3-5, ECF No. 14-8.  On February 1, 2010, as is the practice of that office, the letter was sent to the Department of Public Safety and Correctional Services for appropriate review.  *See id.* at 3.  Davis' allegations were investigated by Detective Scott Peterson of the Internal Investigative Unit (IIU) who began his investigation on February 23, 2010.  *See id.* at 8.  Detective Peterson interviewed Davis on April 12, 2010.  *See id.* at 10. Davis acknowledged that he has held his slot tray open by placing his arm through the slot.  *Id.* Davis told him that he had a scar on his left bicep as a result of the incident.  Detective Peterson noted "what appeared to be a healed injury measuring approximately three inches in length on Davis' left bicep.  *Id.*

Peterson interviewed Davis' witnesses and found their accounts inconsistent.  *See id.* at 8-9 & 19.  Inmate Gary Dewain Pritchett, # 280191 stated that he could not see whether Davis' arm was pinned and could not see Davis' arm at all.  *See id.* at 15.  Pritchett said he could hear the officers tell Davis to move his arm and heard the shield slam against the door.  *Id.*  He said the inmate in cell 1-B-8 told him his arm was going numb.  *Id.*  Pritchett said the shield was in front of the cell for 15 to 20 minutes.  *Id.*  Inmate Gerard Alan Hudson, # 298872 stated he had no knowledge of the incident.  *See id.* at 16.  He said he did not know Davis.  *Id.*  Inmate Troy Damion Poindexter, # 327281 stated Davis' arm was pinned for 1-2 hours.  *See id.* at 16-17. When asked how he was able to observe the incident, Poindexter replied, "Through the door crack. It's not a great view."  *Id.* at 17.  Inmate Donathan Antwion Booth, # 338751 stated

Davis' arm was pinned for 15 to 20 minutes. *See id.*

On June 21, 2010, Peterson interviewed Officers Peters and Cady as part of his inquiry. *Id.* at 13-14. Peters said there was nothing unusual about the placement of the shield on December 20, 2009, and denied that Davis's arm became lodged between the shield and the wall. *Id.* at 13. Peters stated the plastic barrier hung from the top of the cell and was able to swing freely at the bottom. *Id.* at 13. Peters stated there was no written report about the incident because there was nothing unusual about the shield placement. He explained that he does not write a report unless the inmate involved claims injury or use of force. *See id.*

Officer Cady reported that it would be impossible for an arm to be lodged against the shield because it not attached at the bottom. *Id.* at 14. Officer Cady explained there was no report written about the incident because there was no use of force. *Id.* at 14. Detective Peterson was unable to interview Lieutenant Dolly who was on medical leave for an indefinite period. *Id.* at 11.

As part of his investigation, Detective Peterson examined the shield and its placement on the cell door. *Id.* at 17. He observed that it swung freely forward from the bottom and that there is a space of about 3 inches from the front of the cell door to where the shield rests against the wall. *See id.* Based on the examination of the plastic shield, Detective Peterson concluded that it would be ***highly unlikely*** for an inmate's arm to become lodged between it and the wall. *Id.* at 20. (Emphasis added). In his report, Detective Peterson wrote:

> During this investigation it was revealed that the aforementioned plastic security shield is attached to the top of the cell door frame and moves freely from the bottom where it is not affixed to any permanent part of the cell.
>
> Based on an examination of the aforementioned plastic security shield, it

> was evident that it would be highly unlikely that an individual's arm
> could become lodged between the security device and the wall.
>
> This investigation has revealed no corroborating evidence to support the
> made by Inmate Benjamin Davis, # 292280 that Correctional Officer II
> Martin S. Cady or Correctional Officer II Craig M. Peters had
> intentionally placed the security shield on Inmate Davis' arm.

*Id.* at 19.

Peterson also reviewed Davis' medical records.  He concluded there was no evidence that

Davis had sustained any injury or cardiovascular problems on December 20, 2009.  *See id.*

Peterson concluded there was no need for additional action and closed the case.  *See id.*

### E.  Medical Reports

Davis' medical file shows that on December 20, 2009, he was examined by prison

nursing staff for complaints of numbness in his arm.  See Defs. Mot., Ex. 5, Medical Records at

9, ECF No. 14-9.  Davis said his arm had been caught in the slot for 45 minutes.  *Id.* at 9.  An

abrasion was noted and cleaned with sterile water.  *Id.*  There was no bleeding and the arm

moved without difficulty.  *Id.*  Davis was sent back to his cell.  *See id.*

On December 21, 2009, Davis submitted a Sick-Call Request which stated that on

December 20, 2009, "my arm was slam [sic] in door for over 30 min. cutting blood circulation.  I

am experiencing dysfunction to left arm possible nerve damage."  *Id.* at 2.  On December 23,

2009, medical staff recorded on his chart that Davis had refused evaluation and failed to appear

for his appointment.  *See id.*

On December 23, 2009, Davis filed a sick call request that reads, "[o]n December 20,

2009, my bicep was intentionally pin [sic] to the door cutting blood flow over 45 min.  I am

experiencing dysfunction in my left arm, possible nerve damage (numbness).  *Id.* at 3.

On December 29, 2012, Lisa Schindler, a physician's assistant evaluated Davis for his

complaints.  *Id.* at 6.   She observed a mark across the left biceps and noted the area was tender.

*Id*.  Physical exam showed a regular heart rhythm with no murmur, gallops, or rubs.  *See id*.

Davis' medical record reads: "Small abrasion to inner upper arm observed.  Color good."  *Id* at 8.

Range of motion was intact.  *See id*.  Davis was reassured that the area would heal.  *See id*.


## III.     STANDARD OF REVIEW

Rule 56(a) & (c) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense--
> or the part of each claim or defense--on which summary judgment is sought.
> The court shall grant summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is entitled to judgment
> as a matter of law. The court should state on the record the reasons for
> granting or denying the motion.
>
> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the motion
> only), admissions, interrogatory answers, or other materials; or showing that
> the materials cited do not establish the absence or presence of a genuine
> dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

This does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

The party seeking summary judgment bears an initial burden of demonstrating the

absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323

(1986).  Once the moving party has met that burden, the non-moving party must come forward

and demonstrate that such an issue does, in fact, exist.  *See Matsushita Elec. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "The party opposing a properly supported motion for

summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but

rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v.*

*Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P.

56(e)); *see also Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th

Cir. 1988).

The court generally must view all facts and draw all reasonable inferences in the light

most favorable to the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 376-77 (2007).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there

is a 'genuine' dispute as to those facts."  *Id.* at 380.

## IV.  DISCUSSION

A prisoner alleging excessive force must objectively show that a defendant "inflicted

unnecessary and wanton pain and suffering."  *Whitley v. Albers*, 475 U.S. 312, 320 (1986); *See*

*also Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (holding that an Eighth Amendment excessive

force claim requires an objective deprivation of a basic human need and that prison officials

subjectively acted with a sufficiently culpable state of mind).  The subjective component

encompasses "such factors as the need for the application of force, the relationship between the

need and the amount of force that was used, and the extent of injury inflicted."  *Whitley*, 475

U.S. at 321 (internal quotation marks, alterations, and citation omitted).  The objective element

generally requires more than a *de minimis* use of force.  *Hudson v. McMillian*, 503 U.S. 1, 9–10

(1992).  "[T]he use of excessive physical force against a prisoner may constitute cruel and

unusual punishment [even] when the inmate does not suffer serious injury." *Wilkins v. Gaddy*,

130 S.Ct. 1175, 1176 (2010).  A court must look at "the nature of the force rather than the extent

of the injury."  *Id*.  "This is not to say the 'absence of serious injury' is irrelevant to the Eighth

Amendment inquiry."  *Id*. at 1178 (citation omitted).  It is one factor in applying and reviewing

the Eighth Amendment analysis.  *Id*.

When viewed in the light most favorable to Davis, the facts fail to demonstrate that he

was subjected to excessive force in violation of his rights under the Eighth Amendment.  Davis

acknowledges that he stuck his arm through his food slot.  His action created a security risk,

necessitating application of the safety shield.  That protective shield hangs loosely from the

bottom.  Detective Peterson inspected the shield and its placement, determining that it is highly

unlikely that an arm could get stuck between the shield and the wall.  Further, Lieutenant Dolly

attests that Davis had no problem removing his arm from the slot.  Lastly, the uncontroverted

medical record fails to support Davis' claims of injury.   There is no support in the record for

Davis' claim that he slipped out of consciousness and suffered a mild heart attack as a result of

the incident.  At most, Davis sustained a small abrasion after he stuck his arm through the slot

and the plastic shield was placed against his cell door.  The minimal nature of Davis' abrasion

suggests the force about which he complains was neither excessive nor applied in a malicious or

sadistic manner, but consistent with the need to maintain order and safety on the tier by placing

the shield in position after he refused to withdraw his arm.  The totality of the facts reflected in

Defendants' exhibits demonstrates that the shield was placed to ensure security, rather than for

the purpose of maliciously or sadistically causing harm.  There are no genuine issues of material

fact as to whether Defendants subjected Davis to an unconstitutional application of excessive force.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted, and judgment will be entered in their favor.  A separate Order follows.


Date: <u>February 14, 2012</u>                    _____/s/_____
                                                          ROGER W. TITUS
                                                          UNITED STATES DISTRICT JUDGE